# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

№ 21-CV-617 (FB) (RER)

———————————————

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY & GEICO CASUALTY COMPANY,

Plaintiffs,

VERSUS

ELMWOOD PARK MEDICAL GROUP, P.C., MOLNAR MEDICAL SERVICES, P.C. & KRISTAPPA SANGAVARAM,

Defendants.

———————————

**REPORT & RECOMMENDATION**

February 23, 2022

———————————

**TO THE HONORABLE FREDERIC BLOCK**
**SENIOR UNITED STATES DISTRICT JUDGE**

**RAMON E. REYES, JR., U.S.M.J.:**

Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively, "Plaintiffs" or "GEICO") brought this action alleging that the defendants engaged in a complex insurance fraud scheme in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c)–(d). Plaintiffs also allege New York State common law fraud and unjust enrichment claims, and seek a judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02 declaring that the defendants have no right to receive payment for pending bills submitted to GEICO in the course of the fraudulent scheme.

1

In sum, GEICO alleges that the named defendants—two New Jersey professional corporations Elmwood Park Medical Group PC ("Elmwood Park") and Molnar Medical Services P.C. ("Molnar Medical"), and the physician that served as their nominal owner, Kristappa Sangavaram ("Dr. Sangavaram") (collectively, the "Defaulting Defendants")—along with ten New York-based John Doe Defendants that truly owned and controlled the corporations and directed their activities, engaged in a scheme to operate medical practices in violation of state requirements, and to submit fraudulent charges to GEICO for unnecessary, illusory, or otherwise unreimbursable healthcare services purportedly provided to covered individuals.

Before this Court on referral from the Honorable Frederic Block is Plaintiffs' motion for default judgment against the Defaulting Defendants[1] on only the common law fraud and unjust enrichment claims, and on GEICO's request for a declaratory judgment. (ECF No. 18-1 ("Pl's Mem.") at 1 n.1; ECF No. 18-2 ("Sirignano Decl.") at 1 n.1).

After carefully reviewing the record, for the reasons set forth herein, I respectfully recommend that the motion be granted in part, in that (1) judgment be entered against Dr. Sangavaram and Elmwood Park, jointly and severally, in the amount of $842,422.90 in compensatory damages plus pre-judgment interest as calculated below; (2) judgment be entered against Dr. Sangavaram and Molnar Medical, jointly and severally, in the amount of $179,373.37 in compensatory damages plus pre-judgment interest as calculated below; and (3) a declaratory judgment be entered that the Plaintiffs are not obligated to pay the outstanding claims submitted by the Defaulting Defendants.

---

[1] On June 28, 2021, the Court ordered that John Doe Defendants 1–10 be dismissed based on GEICO's voluntary dismissal of claims against them. Accordingly, GEICO does not seek to recover from them in its motion for default judgment. (*See* Notice of Voluntary Dismissal dated June 28, 2021, ECF No. 17; Order dated June 28, 2021).

## BACKGROUND

I.  New York's No-Fault Insurance Law

Under New York's Comprehensive Automobile Insurance Reparations Act, N.Y. Ins. Law §§ 5101 *et seq.*, (the "No-Fault statute"), automobile insurers like GEICO are required to reimburse their insureds up to $50,000 for necessary medical expenses arising from car accidents. N.Y. Ins. Law §§ 5102, 5103. Rather than receive those funds directly, an insured may assign her right to receive payment from the insurer to the healthcare provider that rendered her covered medical services; upon assignment, the provider must submit claims for the services rendered directly to the insurance company to receive payment. (ECF No. 1 ("Compl.") ¶¶ 45–46); 11 N.Y. Comp. Codes R. & Regs ("NYCRR") § 65-3.11(a). Healthcare providers submit claims directly to the insurer using a standard form issued by the New York State Department of Insurance, commonly known as an "NF-3," or by using an alternative claim form, commonly known as the "HCFA-1500." (Compl. ¶ 34). The NF-3 and HCFA-1500 claim forms include a statutorily prescribed warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

(Compl. ¶ 49); N.Y. Ins. Law § 403. Insurers are required to "promptly and fairly process claims," (Compl. ¶ 205), which, under the statute and its implementing regulations, means that they must remit payment within 30 days of receipt of a proof of claim. N.Y. Ins. Law § 5106; 11 NYCRR § 65-3.8(a), (c). Claims are paid according to the New York Workers' Compensation Fee Schedule, and are paid in the order that the loss is incurred. (Compl. ¶ 47); N.Y. Ins. Law § 5106, 5108; 11 NYCRR § 68.1 (adopting workers' compensation board fee schedules for use pursuant to No Fault statute).

A healthcare provider's eligibility for reimbursement from the insurer under the No-Fault statute is conditioned upon compliance with applicable New York State or local licensing requirements. (Compl. ¶¶ 35–36); 11 NYCRR § 65-3.16(a)(12); *State Farm Mut. Auto. Ins. Co. v. Robert Mallela*, 4 N.Y.3d 313, 321 (2005). New York licensing requirements prohibit, *inter alia*, the unlicensed practice of medicine, ownership or control of a medical practice by unlicensed individuals, performance of and supervision over the performance of medical services by unlicensed individuals, and fee-splitting arrangements among licensed and unlicensed individuals for the provision of professional services. (Compl. ¶¶ 38–40) (citing N.Y. Educ. Law §§ 6512, 6530(11), 6530(19)).[2] New York law also prohibits the payment or solicitation of kickbacks in exchange for patient referrals, (Compl. ¶ 38 (citing N.Y. Educ. Law §§ 6509-a, 6530(18), 6531)), and requires that out-of-state medical providers operating in New York apply for and receive a certificate of authority to do business in the state (Compl. ¶ 42–43 (citing N.Y. Educ. L. §§ 6509(8), 6530(12); N.Y. Bus. Corp. Law §§ 1503, 1514, 1530)).[3]

---

[2] New Jersey law imposes substantially similar requirements. *See, e.g.*, N.J. Stat. Ann. § 14A:17-5(a) (permitting organization as a professional corporation only if each prospective shareholder "is duly licensed or otherwise legally authorized to render the same or closely allied professional services."); *id.* § 14A:17-7 ("No professional corporation or foreign professional legal corporation may render professional services in this State except through its officers, employees and agents who are duly licensed or otherwise legally authorized to render such professional services within this state."); N.J. Admin. Code § 13:35-6.16(d) ("Either [a licensed] director, one of the investing licensees, or another licensed health care professional authorized to render those medical services without direct supervision, must be on premises at all times when patients or clients are receiving professional services."); *id.* § 13:35-2.6(d) (requiring that a practitioner invested in a diagnostic or screening office ensure that "the office is wholly owned through an authorized business structure, comprised of practitioners alone or with closely allied health professionals, so long as a majority interest is held by practitioners authorized to perform and interpret all of the tests offered . . . [and] there is a designated physician . . . who has responsibility for the management of the office and for compliance with the specific obligations set forth in this section.") *id.* § 13:35-6.17 (prohibiting fee-splitting and kickbacks).

[3] *See also* N.Y. Corp. L. § 1523 ("No foreign professional service corporation may render professional services in this state except through individuals authorized by law to render such professional services as individuals in this state."); *id.* § 1527 ("Each shareholder, employee or agent of a foreign professional service corporation who performs professional services in this state on behalf of the corporation shall be personally and fully liable and accountable for any negligent or wrongful act or misconduct committed by him or by any person under his direct supervision and control while rendering such professional services, and shall bear professional responsibility for compliance by such corporation with all laws, rules and regulations governing the practice of the profession in this state."); *id.* § 1528 ("No foreign professional service corporation shall engage in any business in this state other than the rendering of the professional services for which it is incorporated and is authorized to do business in this state.").

Failure to comply with these licensing requirements renders a provider ineligible to collect no-fault benefits. (Compl. ¶ 41, 44 (citing *State Farm Mut. Auto. Ins. Co. v. Robert Mallela*, 4 N.Y.3d 313, 321 (2005)).[4] A provider is also ineligible to receive payment if the services are rendered by independent contractors rather than employees, even if those independent contractors are properly licensed. (Compl. ¶ 46 (citing 11 NYCRR § 65-3.11)); *id.* ¶¶ 97–98 (citing ECF No. 1-6 "New York Department of Insurance Opinion Letters")).

## II.  The Parties and the Fraudulent Scheme

The facts below are primarily derived from Plaintiffs' Complaint, and as explained further below, are deemed true for the purposes of liability. Plaintiffs are Maryland corporations that are "authorized to conduct business and to issue automobile polices in New York." (Compl. ¶ 11). Dr. Sangavaram is a New Jersey-based physician licensed to practice medicine in New York and New Jersey. (Compl. ¶¶ 5, 12–13). Dr. Sangavaram has a history of uncontested allegations of professional misconduct in New York and New Jersey, including allegations of fraud, which have resulted in periodic suspensions of his license to practice medicine in both states. (Compl. ¶¶ 15–19). This checkered history "has made it virtually impossible for Sangavaram to find employment as a legitimate physician, and contributed to his motive to participate in the fraudulent scheme" described below. (Compl. ¶ 50).

---

[4] Again, New Jersey law imposes similar requirements in connection with its No-Fault statute. *See, e.g.*, *Allstate Ins. Co. v. Greenberg*, 376 N.J. Super. 623, 630 (Law. Div. 2004) (violation of regulation requiring ownership and supervision by one or more physicians with plenary license rendered bills to insurers unreimbursable); *Prudential Prop. & Cas. Ins. Co. v. Midlantic Motion X-Ray, Inc.*, 325 N.J. Super. 54, 59–60 (Law. Div. 1999) ("The failure of a provider or service to adhere to the aforementioned regulation [requiring that a diagnostic facility be owned and supervised by a licensed physician and that the results of all procedures are interpreted by such physician], or any other significant state statute or agency regulation, renders that provider or service ineligible for reimbursement under the No Fault Act.") (citing *Allstate v. Orthopedic Evaluations, Inc.,* 300 N.J.Super. 510, 516 (App.Div.), *cert. granted* 151 N.J. 67, *affirmed on remand* 304 N.J. Super. 278 (App .Div. 1997)).

According to GEICO, the scheme began in October 2018, when the John Doe Defendants recruited and paid Dr. Sangavaram to incorporate and act as the sham owner of a New Jersey professional corporation—Elmwood Park—which they could jointly use to defraud insurers like GEICO through New York's No-Fault insurance regime as further outlined below. (*See* Compl. ¶ 22, 28, 54, 57–59, 62–63, 67, 71). In order to feign compliance with New Jersey's requirements for establishing a medical practice, Dr. Sangavaram "agreed to falsely represent that he was the true shareholder, director and officer of Elmwood Park and that he truly owned, controlled, and practiced through the professional corporation" in exchange for compensation from Elmwood Park's true owners and operators, the unlicensed John Doe Defendants. (Compl. ¶ 57–58, 62). Beginning in February 2019, to conceal their ongoing fraud at Elmwood Park and to evade detection by insurers, the defendants began transferring patients to a second entity—Molnar Medical—which followed the same playbook and incorporated using Dr. Sangavaram's credentials in March 2019. (*See* Compl. ¶¶ 25, 54, 62–63, 67–70, 123, 126–129).

With Dr. Sangavaram's name and medical license in hand to outwardly fulfill the requirements for starting a medical practice, the unlicensed John Doe Defendants provided start-up costs and investment for Elmwood Park and Molnar Medical, and exercised full control over the companies' day-to-day operations and executive management without the oversight of a licensed physician, in contravention of state requirements. (Compl. ¶ 76, 78–79). Dr. Sangavaram acted "at best, [as] a glorified employee"—he saw no patients, rendered no medical services, took no steps to bring in new patients, exercised no medical judgment, and played no role in overseeing either the practice of medicine or the financial affairs or management of the businesses he purportedly owned. (*See* Compl. ¶¶ 71–87, 93–95, 99–100).

After fraudulently incorporating Elmwood Park and Molnar Medical in contravention of New Jersey law, the defendants acted through the two companies to submit "thousands of fraudulent charges relating to . . . bogus range of motion and muscle strength tests." (Compl. ¶¶ 1–2, 57; *see also* ECF No. 1-3 Ex. 1 to Compl. ("Elmwood Park Sample Charges") (listing 16,082 bills submitted by Elmwood Park to GEICO for services purportedly rendered 1/21/2018–3/14/2019); ECF No. 1-4 Ex. 2 to Compl. ("Molnar Medical Sample Charges") (listing 7,697 bills submitted by Molnar Medical to GEICO for services purportedly rendered 2/18/2019–3/29/2019)). GEICO alleges that the defendants knew: (i) these services "were not medically necessary" and, to the extent that they were provided to patients at all, were provided "pursuant to pre-determined fraudulent protocols designed solely to enrich the Defendants rather than to treat" patients; (ii) that Elmwood Park and Molnar Medical "have been unlawfully owned and controlled by unlicensed laypersons, not by a licensed physician who actually practiced medicine through them" which rendered them "ineligible to bill for or to collect No-Fault benefits"; (iii) that Elmwood Park and Molnar Medical were not legally authorized to provide billed-for medical services in New York at the time the services referenced in the Complaint were rendered; (iv) that the services were provided in connection with "illegal fee-splitting, kickback and referral arrangements"; (v) that "the billing codes used . . . misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; and" (vi) "in many cases, [services] were provided by independent contractors, rather than by employees of [Elmwood Park or Molnar Medical], and therefore were unreimbursable under New York law." (Compl. ¶ 6).

To accomplish their scheme, and despite lacking authorization to operate medical practices in New York State, the defendants purportedly provided medical services to patients at forty-six "revolving door" clinics located across the New York Metropolitan area. (Compl. ¶ 56, 109–112,

138). According to GEICO, the defendants purportedly rendered medical treatment to insured patients at these clinics, and paid the clinics for legitimate overhead expenses such as space or personnel, or to perform legitimate administrative services like marketing and billing; in reality, defendants were engaged in "'pay-to-play' arrangements," making kickback payments to the clinics based on the volume of insured patients referred to Elmwood Park and Molnar Medical to receive medically unnecessary services. (Compl. ¶¶ 118–120). GEICO alleges that the defendants knew these arrangements were illegal, took affirmative steps to conceal their existence, and relied upon them to provide a steady stream of insured patients "to execute the fraudulent treatment and billing protocol." (Compl. ¶¶ 121–123).

GEICO alleges that the patients funneled through the clinics were subjected "to a pre-determined fraudulent treatment protocol without regard for . . . individual symptoms or presentment." (Compl. ¶ 139). The treatment included medically unnecessary sessions of range of motion/muscle testing ("ROM/MT") and medically unnecessary Activity Limitation Tests ("ALM Tests").[5] (Compl. ¶¶ 143, 176). GEICO alleges that such tests, to the extent rendered at all, were duplicative of manual tests that patients had already received, were "unbundled" or otherwise improperly billed so as to maximize the charges submitted to GEICO, and were submitted in a way that misrepresented the existence of corresponding written, interpretive reports. (Compl. ¶¶ 153–190). Further, to the extent patients received these services at all, GEICO alleges that these services were further rendered unreimbursable because Elmwood Park and Molnar Medical conducted the tests through technicians who were hired as independent contractors rather than

---

[5] Notably, New Jersey law entirely prohibits medical professionals from billing for "computer supported range of motion tests" like those at issue here because such tests "are not recognized in the scientific community as being capable of yielding data of sufficient clinical value in the development, evaluation, or implementation of a plan of treatment." N.J. Admin. Code § 13:35-2.6(c)(1)(ix); *see also id.* § 13.35-2.6(q)(5)(i) ("Bills for diagnostic or screening tests submitted for payment . . . shall reflect . . . no charge for any test: designated pursuant to (c) above to be without apparent clinical value and thus lacking validity.").

employees, and because those technicians conducted the tests without supervision by a licensed physician. (Compl. ¶¶ 70, 95–108, 129, 200).

Following the supposed treatments, defendants "systematically submitted or caused to be submitted thousands of claims via NF-3 forms, HCFA-1500 forms, and treatment reports" through Elmwood Park and Molnar Medical to GEICO seeking payments that the defendants were not entitled to receive. (Compl. ¶ 191). GEICO alleges that these submissions were materially false and misleading because they: misrepresented to GEICO that the services were medically necessary, misrepresented that Elmwood Park and Molnar Medical were properly licensed and controlled by a physician, rather than unlicensed laypersons; misrepresented that Elmwood Park and Molnar Medical were authorized to operate in New York; concealed the existence of the kickback arrangements among defendants and the clinics; misrepresented and exaggerated the level and nature of services; and misrepresented the fact that the services were performed by independent contractors, rather than employees. (Compl. ¶ 192). GEICO also alleges that despite having an obligation to act honestly in submitting charges, the defendants knowingly made these representations and concealed these material facts regarding Elmwood Park and Molnar Medical. (Compl. ¶¶ 195–201). Moreover, because the defendants acted through multiple entities to conceal the overall scheme and evade detection (Compl. ¶ 122–129, 202), and because the defendants doggedly pursued collection of the fraudulent charges when they were not quickly paid in full (Compl. ¶ 204), GEICO relied on the facial validity of the submissions and promptly processed the claims according to its statutory and contractual obligations before discovering their fraudulent nature (Compl. ¶ 203, 205–06).

III.  Procedural History

GEICO brought this action on February 5, 2021. (Compl.). The Complaint alleges common law fraud and unjust enrichment under New York law and violations of the RICO statute, and seeks damages of more than $2,880,800. (Compl. ¶¶ 216–57). GEICO also seeks a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that the defendants "have no right to receive payment for any pending bills, totaling about $1,128,000, submitted to GEICO." (Compl. ¶ 257).

After receiving proper service of the summons and Complaint, all three of the Defaulting Defendants failed to appear. (*See* ECF Nos. 8–10).[6] The Clerk of Court subsequently entered defaults as to each of the Defaulting Defendants on April 7, 2021. (*See* ECF Nos. 14–16). GEICO filed its motion for default judgment on June 28, 2021. (*See* ECF No. 18 ("Mot. for Default J.")) All three Defaulting Defendants were properly served with the motion for default judgment and supporting papers. (*See* ECF Nos. 19, 20, 21).[7] Pursuant to Local Rule 55.2, GEICO also mailed the motion for default judgment to Dr. Sangavaram's home address and to the last known business address of Elmwood Park and Molnar Medical. (ECF No. 22 at 1). In its motion, GEICO moves

---

[6] As foreign corporations authorized to do business in New York, Elmwood Park and Molnar Medical were properly served by delivery of the summons and Complaint to the New York Secretary of State. (*See* ECF No. 8 at 1; ECF No. 10 at 1; Fed. R. Civ. P. 4(e)(1); N.Y. C.P.L.R. § 311(1); N.Y. Gen. Bus. Law § 306(b)(1). Dr. Sangavaram was served by personal delivery of the summons and Complaint to his home in Englewood Cliffs, New Jersey. (ECF No. 9 at 1). Although Dr. Sangavaram was served outside of New York, service was nevertheless proper given this Court's specific personal jurisdiction over the defendants based on their tortious conduct in New York state. *See* N.Y. C.P.L.R. §§ 302(2), 308, 313 (permitting service without the state by personal delivery upon persons subject to long arm jurisdiction).

[7] Elmwood Park and Molnar Medical were again properly served by delivery of the motion and supporting papers to the New York Secretary of State. (*See* ECF Nos. 20, 21); Fed. R. Civ. P. 4(e)(1); N.Y. C.P.L.R. § 311(1); N.Y. Gen. Bus. Law § 306(b)(1). With respect to Dr. Sangavaram, service was completed by leaving a copy of the motion and supporting papers with his seventeen-year-old daughter upon delivery at his home in New Jersey. (ECF No. 19 at 1). Under New York law, teenage children have been found to be "of suitable age and discretion" such that service by delivery to them is sufficient. *Accord Bossuk v. Steinberg,* 58 N.Y.2d 916, 918 (1983); *Roldan v. Thorpe*, 117 A.D.2d 790, 792 (N.Y. App. Div. 1986); *Choi Yim Chi v. Miller*, 63 Misc. 3d 354, 359 (N.Y. Sup. Ct. 2019). Accordingly, service of the motion was proper. *See* Fed. R. Civ. P. 4(e)(1); N.Y. C.P.L.R. §§ 302, 308, 313.

only on the causes of action alleging common law fraud and unjust enrichment and seeking a declaratory judgment. (Pl's Mem. at 1 n.1).

## **DISCUSSION**

I.  Liability

Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment. First, "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Following the clerk's entry of default, a plaintiff may request that the court enter default judgment against the defaulting party. Fed. R. Civ. P. 55(b)(2). "A default judgment is ordinarily justified where a defendant fails to respond to the complaint." *J & J Sports Prods., Inc. v. Ahuachapan Corp.*, 422 F. Supp. 3d 652, 662 (E.D.N.Y. 2019) (quoting *SEC v. Anticevic*, No. 05-CV-6991 (KMW), 2009 WL 4250508, at *2 (S.D.N.Y. Nov. 30, 2009).

Before entering a default judgment, a court must determine whether the factual allegations in the complaint establish the defaulting party's liability on each cause of action as a matter of law. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011). In making that determination, a court must accept the well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d. Cir. 2009) (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).

GEICO seeks a default judgment on its New York state common law fraud and unjust enrichment claims. I will address each in turn.

A.   Common Law Fraud

GEICO alleges that the Defaulting Defendants are liable for common law fraud. (Compl. ¶¶ 216–222, 229–235; Pl's Mem. at 10–16). "To state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015) (citing *Crigger v Fahnestock & Co.,* 443 F.3d 230, 234 (2d Cir. 2006)).

Fraud claims are "subject to the particularity pleading requirements of Federal Rule of Civil Procedure 9(b) 'which requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Id.* at 402–03 (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir.2004)).

1.   Material Representation or Omission of Fact

GEICO has described in detail the Defaulting Defendants' participation in a scheme to submit charges for reimbursements which they were not eligible to receive. (Compl. ¶¶ 4, 6–9, 50–206). Specifically, GEICO alleges that the Defaulting Defendants caused the submission of NF-3 and HCFA-1500 forms, which falsely certified that they were properly authorized to render services in New York and were eligible to bill under New York's No-Fault statute, and misrepresented that the services they charged for were performed by employees, when in fact the services, to the extent performed at all, were performed by independent contractors. (Compl. ¶¶ 191–192). Further, the Complaint alleges that the Defaulting Defendants omitted from these bills related material facts

regarding the circumstances that rendered them ineligible to receive no-fault benefits. (Compl. ¶¶ 195–202).

In addition to describing the scheme generally, GEICO provides detailed charts listing a representative sample of the charges that the Defaulting Defendants submitted or caused to be submitted to GEICO, the date GEICO received each submission, and the claim numbers that correspond with each submission. (Compl. ¶¶ 8, 60, 65, 124–126, 135; Elmwood Park Sample Charges; Molnar Medical Sample Charges). The Complaint alleges that each listed bill contained the false certifications and omissions referenced above, and that each requested reimbursement was prohibited under the No-Fault law. (Compl. ¶¶ 6–8, 135).

GEICO's allegations and the supporting charts are sufficient to establish with particularity the first element of common law fraud. *See, e.g.*, *Gov't Emps. Ins. Co. v. Badia*, No. 13-CV-1720 (CBA) (VMS), 2015 WL 1258218, at *14–15 (E.D.N.Y. Mar. 18, 2015) (collecting cases where allegations of fraudulent incorporation, concealment of using independent contractors, concealment of a fee-splitting arrangements and kickback schemes, and misrepresentations regarding medical necessity, are found to satisfy the first element of common law fraud claim, and noting that "Plaintiffs' very detailed chart . . . listing claim submission dates, claim numbers and claim-demand amounts" satisfies Rule 9(b)'s particularity requirement); *see also Allstate Ins. Co. v. Avetisyan*, No. 17-CV-4275 (RPK) (RML), 2021 WL 1227625, at *5 (E.D.N.Y. Mar. 5, 2021) (claims charts containing allegedly false statements or claims made by each of the defendants and when those claims were made are sufficient to meet the Rule 9(b) standard), *adopted by* 2021 WL 1224101 (E.D.N.Y. Mar. 31, 2021); *Gov't Emps. Ins. Co. v. Erlikh*, No. 16-CV-7120 (DLI) (SJB), 2019 WL 1487576, at *5 (E.D.N.Y. Feb. 28, 2019) ("By alleging that the Defaulting Defendants made the fraudulent statements or omissions and that every bill—each of which is identified, dated,

and names the service provider—was fraudulent because they contained those statements or omissions, GEICO has satisfied the first element of common law fraud and the requirements of Rule 9(b).”), *adopted by* (Order dated 3/31/2019); *Gov't Emps. Ins. Co. v. Alrof, Inc*., No. 11-CV-4028 (SLT) (RER), 2013 WL 9600668, at *5 (E.D.N.Y. July 19, 2013) (“Plaintiffs set forth examples and described in detail how the Retail Defendants submitted charges for items more expensive than those actually dispensed, if dispensed at all. Plaintiffs have also supplied a schedule detailing when the Retail Defendants’ claims were paid. Accordingly, Plaintiffs have pled the fraud with sufficient particularity[.]”) (citations omitted), *adopted sub nom. Gov't Emps. Ins. Co. v. Park Slope Med. & Surgical Supply, Inc*., 2013 WL 5209415 (E.D.N. Y Sept. 13, 2013); *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 373 (E.D.N.Y. 2012) (“Allstate attaches to its Complaint a series of charts that include each of the charges submitted by the defendants that it believes were fraudulent. The charts detail the entity that submitted each claim, as well as the corresponding claim number, the year Allstate paid the claim, and the amount paid by Allstate. Such information clearly directs defendants to the specific misrepresentations Allstate is alleging. Under the circumstances, the specificity requirement of 9(b) requires no more[.]”) (citations omitted).

2. <u>Knowledge and Intent to Defraud</u>

Under Rule 9(b), “[m]alice, intent, knowledge, and other condition[s] of mind of a person may be averred generally.” Fed. R. Civ. P. 9(b). However, “[c]ourts ‘must not mistake the relaxation of [Rule] 9(b)’s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.’” *Badia*, 2015 WL 1258218 at *15 (quoting *Lerner v. Fleet Bank, N.A*., 459 F.3d 273, 290 (2d Cir.2006)). “‘The requisite “strong inference” of fraud may be established either (a) by alleging facts to show the defendants had both motive and opportunity to

commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* (quoting *Lerner*, 459 F.3d at 290); *see also GEICO v. Hollis Med. Care*, P.C., No. 10 Civ. 4341(ILG) (RML), 2011 WL 5507426, at *8 n.11 (E.D.N.Y. Nov. 9, 2011) ("In order to satisfy the scienter requirement, a plaintiff must allege[, among other possibilities,] facts which demonstrate that the defendant had both the motive and a clear opportunity to commit the fraud."). "The intent prong of common law fraud is established 'when it is clear that a scheme, viewed broadly, is necessarily going to injure.'" *Gov't Emps. Ins. Co. v. Scheer*, No. 13-CV-04039 (SLT) (SMG), 2014 WL 4966150, at *6 (E.D.N.Y. Aug. 18, 2014), (quoting *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 220–21 (2d Cir.2000)), *adopted by* 2014 WL 4966137 (E.D.N.Y. Sept. 30, 2014).

GEICO avers in detail that the Defaulting Defendants knew that the claims they submitted were fraudulent, and that the submissions were made as part of an intentional scheme to defraud the insurer. (Compl. ¶¶ 6, 195–201). GEICO also alleges specifically that Dr. Sangavaram's history of professional discipline limited his options for legitimate practice and "contributed to his motive to participate in the fraudulent scheme." (Compl. ¶¶ 15–19, 50). Beyond Dr. Sangavaram's individual motive to defraud, GEICO alleges that the Defaulting Defendants were collectively motivated to receive substantial payments to which they were not entitled, and had the opportunity and ability to receive those payments by submitting fraudulent claims to GEICO. (Compl. ¶¶ 10, 50–70, 90–108, 195–206); *see also Erlikh*, No. 16-CV-7120 (DLI) (SJB), 2019 WL 1487576 at *6 (defendants "intentionally made . . . false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges"). Such motive and opportunity are sufficient to infer that the Defaulting Defendants acted with intent to defraud. *See, e.g.*, *Gov't Emps. Ins. Co. v. Parkway Med. Care, P.C.*, No. 15-CIV-3670 (FB) (VMS), 2017 WL 1133282,

at *8 (E.D.N.Y. Feb. 21, 2017) ("Plaintiffs sufficiently establish scienter, as Defaulting Defendants had a strong motive to commit fraud, i.e., to gain a financial benefit of hundreds of thousands of dollars, and opportunity to commit fraud, i.e., misrepresenting in submissions to Plaintiffs that PC Defendants were lawfully incorporated, that the healthcare services provided were medically necessary, and that the services were provided by licensed healthcare providers rather than by unlicensed technicians.") (citing *Gov't Emps. Ins. Co. v. Spectrum Neurology Grp., LLC*, No. 14-CV-5277 (ENV) (SMG), 2016 WL 11395017, at *4 (E.D.N.Y. Feb. 17, 2016), *adopted sub nom. Gov't Emps. Ins. Co. v. Premier Pro. Servs., LLC*, 2016 WL 1071099 (E.D.N.Y. Mar. 18, 2016); *Gov't Emps. Ins. Co. v. Infinity Health Prods., Ltd.*, No. 10-CV-5611 (JG) (JMA), 2012 WL 1427796, at *5 (E.D.N.Y. Apr. 6, 2012), *adopted by* 2012 WL 1432213 (E.D.N.Y. Apr. 25, 2012)), *adopted by* 2017 WL 1131901 (E.D.N.Y. Mar. 24, 2017); *Gov't Emps. Ins. Co. v. Li-Elle Serv., Inc.*, No. 12-CV-2157 (KAM) (VMS), 2013 WL 829302, at *7 (E.D.N.Y. Feb. 11, 2013) ("Plaintiffs allege that Defendants not only knew that they were submitting fraudulent claims to Allstate, but that they did so intentionally in a scheme for profit. This gives rise to a strong inference of fraudulent intent and is sufficient to establish the scienter requirement.") (citation omitted), *adopted as modified*, 2013 WL 829274, at *1 (E.D.N.Y. Mar. 6, 2013). And, viewed broadly, the Defaulting Defendants' scheme was designed to draw funds away from GEICO such that it would necessarily injure, and included several tactics designed to avoid detection and prolong that injury. GEICO has therefore established the second and third elements of common law fraud.

      3.  <u>Reasonable Reliance, Causation, and Injury</u>

"A plaintiff's reliance on intentionally fraudulent statements is reasonable without further investigation when 'matters are held to be peculiarly within defendant's knowledge, as plaintiff

has no independent means of ascertaining the truth.'" *Gov't Emps. Ins. Co. v. Scheer*, No. 13-CV-04039 (SLT) (SMG), 2014 WL 4966150, at *6 (E.D.N.Y. Aug. 18, 2014) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir.1997) (alterations omitted), *adopted by* 2014 WL 4966137 (E.D.N.Y. Sept. 30, 2014). In the context of insurance fraud schemes, courts in this district regularly find that "[i]nsurance companies are permitted to rely on 'facially valid' insurance reimbursement claims." *Erlikh*, 2019 WL 1487576 at *7 (citing *Gov't Emps. Ins. Co. v. IAV Med. Supply, Inc.*, No. 11-CV-4261 (ARR) (RER), 2013 WL 764735, at *5 (E.D.N.Y. Feb. 8, 2013), *adopted by* 2013 WL 765190 (E.D.N.Y. Feb. 28, 2013)); *see also Spectrum Neurology*, 2016 WL 11395017 at *4 ("Plaintiffs have also adequately alleged reasonable reliance by explaining that statutory and contractual requirements obligate plaintiffs to respond promptly to facially valid claims submitted under New York's no-fault statutory scheme, and thus limit plaintiffs' opportunity to scrutinize and investigate the propriety of apparently legitimate claims for reimbursement.") (citing *Gov't Emps. Ins. Co. v. Damien*, 2011 WL 5976071, at *4 (E.D.N.Y. Nov. 3, 2011), *adopted by* 2011 WL 6000571 (E.D.N.Y. Nov. 29, 2011)).

GEICO alleges that the Defaulting Defendants falsely represented their eligibility to receive reimbursement in claims submitted to GEICO (Compl. ¶¶ 191–201), and that GEICO relied on the facial validity of the Defaulting Defendants' submissions to "promptly and fairly process" those claims in accordance with its standard office practices and pursuant to its statutory and contractual obligations (Compl. ¶ 203, 205). Relying on these facially valid documents, GEICO alleges that it paid the Defaulting Defendants $1,021,796.27 which it was not required to pay and which Defaulting Defendants were not entitled to receive. (Compl. ¶ 220, 233; ECF No. 18-6 ("Asmus Decl.") ¶ 8; ECF No. 18-7 Ex. 1 to Asmus Decl. ("TIN Run") at 62, 79). Accordingly, the Court concludes that GEICO has sufficiently alleged the remaining elements of common law fraud.

In light of the foregoing, I respectfully recommend that the Court grant Plaintiffs' default judgment motion and hold Defaulting Defendants liable for New York common law fraud.

    B.  <u>Unjust Enrichment</u>

"A New York common law quasi-contract cause of action," an unjust enrichment claim requires that a plaintiff establish "'1) that the defendant benefitted; 2) at plaintiff's expense; and 3) that equity and good conscience require restitution.'" *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir.2000)). Such claims are intended to "protect[] a plaintiff only in those circumstances where she has no other recourse in tort or contract." *Gov't Emps. Ins. Co. v. Armengol*, No. 20-CV-6052 (RPK) (SJB), 2022 WL 432320, at *7 (E.D.N.Y. Jan. 19, 2022), *adopted in part by* 2022 WL 426163 (E.D.N.Y. Feb. 11, 2022); *see also Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.").

GEICO's unjust enrichment claims are premised on defendants alleged misrepresentations and fraudulent activity, which caused GEICO to remit payment for claims for which they were not entitled to reimbursement. (Compl. ¶¶ 223–28, 236–241). By accepting those payments, the Defaulting Defendants benefitted at GEICO's expense. Although GEICO has convinced the Court that the Defaulting Defendants were unjustly enriched at its expense, finding liability on its unjust enrichment claims would be inappropriate given that they are based on the same transactions and conduct as the common law fraud claims. *See, e.g.*, *Armengol*, 2022 WL 432320 at *7 (denying liability for unjust enrichment claims on default judgment motion under similar circumstances to those here); *Spinnato v. Unity of Omaha Life Ins. Co.*, 322 F. Supp. 3d 377, 404 (E.D.N.Y. 2018) (dismissing unjust enrichment claims that "rehash[] and improperly duplicate[] . . . fraud claims"

that were "based on the same set of facts"); *accord Spectrum*, 2016 WL 11395017 at \*4, \*7 (finding liability for unjust enrichment claims but denying application for damages on those claims because they would be duplicative). Because they are duplicative of its fraud claims, GEICO is not entitled to a default judgment on its unjust enrichment claims.

In light of the foregoing, I respectfully recommend that the Court deny Plaintiffs' motion with respect to the unjust enrichment claims.

## II.   Damages

"While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)). Rather, a court "must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (citing *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir.1997)). In performing such an inquiry, a court may conduct an evidentiary hearing or may forego such a hearing and rely upon detailed affidavits and documentary evidence submitted by the moving party. *See* Fed. R. Civ. P. 55(b)(2)(B)–(D) ("The court may conduct hearings . . . when, to enter or effectuate [default] judgment, it needs to: . . determine the amount of damages; establish the truth of any allegation by evidence; or investigate any other matter."); *Finkel v. Romanowicz*, 577 F.3d 79, 87 (2d Cir. 2009) (Rule 55 "commits [the] decision" to conduct an evidentiary hearing "to the sound discretion of the district court."); *J & J Sports Prods., Inc. v. Ahuachapan Corp.*, 422 F. Supp. 3d 652, 662 (E.D.N.Y. 2019) ("Plaintiff bears the burden of presenting proof of damages, which may take the form of documentary evidence and detailed affidavits.") (citing *CIT Bank, N.A. v. Dambra*, No. 14-CV-3951 (SLT) (VMS), 2015 WL

7422348, at *5 (E.D.N.Y. Sept. 25, 2015); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991)).

In this case, the Court need not hold a hearing because it can determine damages based on the Plaintiffs' detailed submissions and sworn statements. Specifically, GEICO has submitted declarations from Michael A. Sirignano, counsel for Plaintiffs (Sirignano Decl.), and from Kathy Asmus, Claims Manager at GEICO, (Asmus Decl.), and has submitted additional supporting documents to demonstrate damages (TIN Run; ECF No. 18-8 Ex. 2 to Asmus Decl. ("Claim Run"); ECF No. 18-9 Ex. 3 to Asmus Decl. ("Litigation and Arbitration Run"); ECF No. 18-10 ("Pre-Judgment Interest Charts")).

A. <u>Compensatory Damages</u>

GEICO seeks damages in the amount equal to the payments they have made to the Defaulting Defendants. (Sirignano Decl. ¶ 16–17; Asmus Decl. ¶ 8; TIN Run at 62, 79). For the reasons discussed above, Defaulting Defendants were not entitled to submit claims for reimbursement, and the payments GEICO made to them are therefore appropriately recovered. Drawing from its earnings report system, GEICO has submitted records of the payments they made to Elmwood Park and Molnar Medical. (Asmus Decl. ¶ 4; TIN Run). GEICO uses the system to generate IRS Forms 1099-MISC for payees and to report information to the Internal Revenue Service, which suggests its reliability, and the information relating to Defaulting Defendants was assembled using their tax identification numbers. (Asmus Decl. ¶ 4). These records indicate that GEICO made $1,021,796.27 in payments to the Defaulting Defendants, with $842,422.90 paid directly to Elmwood Park and $179,373.37 paid directly to Molnar Medical. (Asmus Decl. ¶ 8; Sirignano Decl. ¶ 16; TIN Run at 62, 79).

For these damages, GEICO seeks to hold the Defaulting Defendants jointly and severally liable. (Pl's Mem. at 18–19). "'Under New York law, where defendants acted jointly and/or concurrently to produce a single injury, those defendants must be held jointly and severally liable for all of the harm resulting from their actions.'" *Armengol*, 2022 WL 432320 at *8 (quoting *Infinity Health Prods*, 2012 WL 1432213 at *1). "'Joint and several liability may . . . be imposed where a plaintiff demonstrates that the harm it suffered as a result of the conduct of two or more defendants is indivisible.'" *Id.* (quoting *Spectrum Neurology*, 2016 WL 11395017 at *6) (internal quotation marks omitted). On the other hand, "[c]ourts have found that an injury is divisible for the purposes of determining joint and several liability where there has been a clear allocation of fault between each defaulting defendant." *Id.* (citing *Parkway Med. Care*, 2017 WL 1133282 at *15).

GEICO adequately alleges that Dr. Sangavaram, is jointly and severally liable for the damages attributed to Elmwood Park and Molnar Medical as the nominal owner of those entities and as a direct participant in the submission (or in causing the submission) of the fraudulent claims to GEICO through those entities. (Compl. ¶¶ 2–3, 22, 25, 50–88, 122–129, 191–206); *see also Armengol*, 2022 WL 432320 at *8 ("GEICO has adequately alleged that [defaulting individual defendant], as the nominal owner of the Provider Defendants, is jointly and severally liable for the damages attributed to each of the Provider Defendants that she nominally owned and submitted fraudulent claims through."); *Avetisyan*, 2021 WL 1227625 at *8 n.5 (finding joint and several liability where owners submitted or caused to be submitted fraudulent claims to Allstate through their respective companies); *Parkway Med. Care*, 2017 WL 1133282 at *14 (finding nominal owners jointly and severally liable for the damages attributed to PC Defendants they owned).

However, because GEICO has submitted information allocating specific responsibility for individual claims and amounts to both Elmwood Park and Molnar Medical (Elmwood Park Sample Charges; Molnar Medical Sample Charges; TIN Run), she has not demonstrated that her injury was indivisible such that joint and several liability between those two entities is appropriate. *See, e.g.*, *Armengol*, 2022 WL 432320 at *8 (finding joint and several liability between owner and entity, but not among entities themselves where GEICO claim charts establish fraudulent claims identifiable by each entity); *Spectrum Neurology*, 2016 WL 11395017 at *6–7 (finding joint and several liability as between two separate providers inappropriate where "plaintiffs' submissions identify claims submitted by each defaulting defendant, indicate which defendant is responsible for each claim, and list the amounts paid to each defendant."); *Allstate Ins. Co. v. Nazarov*, No. 11-CV-6187 (PKC) (VMS), 2015 WL 5774459, at *17–18 ( E.D.N.Y. Sept. 30, 2015) (declining to recommend imposition of joint and several liability where defendants, although controlled by the same individual, each submitted their own fraudulent documents seeking reimbursement).

Accordingly, I recommend that GEICO be awarded damages of $842,422.90 jointly and severally against Dr. Sangavaram and Elmwood Park; and that GEICO be awarded damages of $179,373.37 jointly and severally against Dr. Sangavaram and Molnar Medical. (Sirignano Decl. ¶ 17; Asmus Decl. ¶ 8).

### B. Prejudgment Interest

GEICO also seeks prejudgment interest at a rate of nine percent per year on its fraud damages. (Pl's Mem. at 17–18; Sirignano Decl. ¶ 19; Pre-Judgment Interest Charts). "'In diversity cases, the award of prejudgment interest is a substantive issue, governed by New York law.'" *Armengol*, 2022 WL 432320 at *10 (quoting *IAV Med. Supply, Inc.*, 2013 WL 764735 at *8); *see also Terwilliger v. Terwilliger*, 206 F.3d 240, 249 (2d Cir. 2000) ("The award of prejudgment interest

is a substantive issue governed here by New York law.") (citing *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999)).

New York law specifically mandates an award of pre-judgment interest on damages awarded for fraud. *Parkway Med. Care*, 2017 WL 1133282 at *17 (citing *Chubb & Son, Inc. v. Kelleher*, No. 92 CV 4484 (TLM) (RML), 2010 WL 5978913 at *8 (E.D.N.Y. Oct. 22, 2010); *Mfrs. Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 28 (2d Cir.1986); *Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 269 (E.D.N.Y. 2012)); *see also Badia*, 2015 WL 1258218 at *24. New York law typically requires the computation of interest "from the earliest ascertainable date the cause of action existed," N.Y. C.P.L.R. § 5001(b), and is typically awarded "at the rate of nine per centum per annum, except where otherwise provided by statute," *id.* § 5004. "'In the context of insurance fraud, prejudgment interest accrues from the date the insurance company makes payment.'" *Parkway Med. Care*, 2017 WL 1133282 at *17 (quoting *Gov't Emps. Ins. Co. v. AMD Chiropractic, P.C.*, No. 12-CV-4295 (NG) (JO), 2013 WL 5131057, at *9 (E.D.N.Y. Sept. 12, 2013)) (internal quotation marks omitted).

GEICO requests that the court apply a more conservative calculation, and asks that prejudgment interest be computed from the "first day following the year in which payments were made on the fraudulent claims by GEICO to the Defaulting Defendants." (Pl's Mem. at 18). "This methodology has been followed in this district in other no-fault insurance fraud cases awarding damages on default judgment." *Parkway Med. Care*, 2017 WL 1133282 at *17 (citing *AMD Chiropractic*, 2013 WL 5131057 at *9); *see also Spectrum Neurology*, 2016 WL 11395017 at *7; *IAV Med. Supply, Inc.*, 2013 WL 764735 at *9.

In support of their request for prejudgment interest, Plaintiffs provide a sworn declaration, (Sirignano Decl. ¶ 19), and an accompanying chart calculating the interest in accordance with their

preferred methodology (Pre-Judgment Interest Charts). In applying their methodology, Plaintiffs calculated interest accrued through July 1, 2021, and did not include payments made to Elmwood Park or to Molnar Medical in the year 2021. (Pre-Judgment Interest Charts at 2–3; Sirignano Decl. ¶ 19). Using the information supplied by GEICO, the Court accordingly applies Plaintiff's methodology to calculate prejudgment interest on claims paid to Elmwood Park and to Molnar Medical up to the filing of this Report and Recommendation as follows:

| | Elmwood Park | | | |
|---|---|---|---|---|
| Billing Year | 2019 | 2020 | 2021 | Total Paid |
| Total Claims Paid | $835,506.94 | $3,657.92 | $3,258.04 | $842,422.90 |
| Interest rate | 0.09 | 0.09 | 0.09 | |
| Time (in Years)[8] | 2.144 | 1.144 | 0.144 | |
| | | | | Total Interest |
| Interest accrued | $161,219.42 | $376.62 | $42.22 | **$161,638.26** |

| | Molnar Medical | | | |
|---|---|---|---|---|
| Billing Year | 2019 | 2020 | 2021 | Total Paid |
| Total Claims Paid | $174,645.70 | $2,351.26 | $2,376.41 | $179,373.37 |
| Interest Rate | 0.09 | 0.09 | 0.09 | |
| Time (in Years) | 2.144 | 1.144 | 0.144 | |
| | | | | Total Interest |
| Interest Accrued | $33,699.63 | $242.09 | $30.80 | **$33,972.52** |

(*See* Pre-Judgment Interest Charts at 2–3; TIN Run at 61–62,79).

Based on the foregoing calculations, I respectfully recommend that GEICO be awarded a total amount of prejudgment interest of $161,638.26 jointly and severally against Dr. Sangavaram and Elmwood Park; and a total amount of prejudgment interest of $33,972.52 jointly and severally against Dr. Sangavaram and Molnar Medical.

---

[8] As of Wednesday, February 23, 2022, where one month = .083 years, one week = 0.019 years, and one day = 0.0027 years.

Plaintiffs are also entitled to per diem interest from the date of this Report and Recommendation to the final entry of judgment, should this Report and Recommendation be adopted. The per diem is calculated by multiplying the daily interest rate by the principal.[9] For Elmwood Park, the per diem is $206.92. For Molnar Medical, the per diem is $43.64.

## III. Declaratory Judgment

In addition to damages for claims above, GEICO seeks a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that the defendants "have no right to receive payment for any pending bills, totaling about $1,128,000, submitted to GEICO." (Compl. ¶ 257). Under the Declaratory Judgment Act, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "The DJA 'is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant. The propriety of issuing a declaratory judgment may depend upon equitable considerations, and is also informed by the teachings and experience concerning the functions and extent of federal judicial power.'" *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 106 n.7 (2d Cir. 2012) (quoting *Green v. Mansour*, 474 U.S. 64, 72 (1985)).

"A court may consider whether to enter a declaratory judgment only if the action presents an actual case or controversy that is 'real and immediate, allowing specific and conclusive relief,' and 'ripe for adjudication.'" *Spectrum Neurology*, 2016 WL 11395017 at *4 (quoting *U.S. Underwriters Ins. Co. v. Kum Gang, Inc.,* 443 F. Supp. 2d 348, 352 (E.D.N.Y. 2006)). Relief under the act "is appropriate '(1) where the judgment will serve a useful purpose in clarifying and settling

---

[9] The daily interest rate is calculated by multiplying the annual interest rate by the days in the year. In this case, that calculation is: 0.09 x 365 = .00024658. The principal for each calculation is the total amount paid by GEICO to each provider.

the legal relations in issue; or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Allstate Ins. Co. v. Williams*, No. 13-CV-2893 (RJD) (JO), 2015 WL 5560543, at *6 (E.D.N.Y. Aug. 28, 2015) (quoting *Md. Cas. Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir.1971)), *adopted sub nom. Allstate Ins. Co. v. Dublin*, 2015 WL 5560546 (E.D.N.Y. Sept. 21, 2015).

The complaint alleges that Elmwood Park and Molnar Medical have submitted fraudulent bills to GEICO that remain unpaid and in dispute. (Compl. ¶¶ 207–215). Indeed, according to GEICO the Defaulting Defendants retained a number of law firms to pursue collection of unpaid claims through hundreds of separate arbitration or civil court collection proceedings in order to expend GEICO's time and resources in defending those claims and to obfuscate the complex, interconnected nature of the fraud. (Compl. ¶ 193–194, 204). Documents GEICO submitted to substantiate these claims indicate that $476,415.86 in unpaid claims associated with Elmwood Park are actively in dispute, of which $195,288.52 is subject to 275 ongoing civil litigations in New York state courts and in arbitrations, and that $563,434.24 in unpaid claims associated with Molnar Medical are actively in dispute, of which $427,914.26 is subject to 524 ongoing civil litigations in New York state courts and in arbitrations. (Asmus Decl. ¶ 10–11; *see also* Litigation and Arbitration Run).

The Court finds that GEICO has sufficiently established that these unpaid claims constitute an actual controversy, and that a declaratory judgment would provide specific and conclusive relief from the uncertainty that those claims pose. Courts in this district routinely grant declaratory relief in similar circumstances, where fraudulently incorporated medical practices have fraudulent claims pending against insurers for No-Fault benefits. *See, e.g.*, *Avetisyan*, 2021 WL 1227625 at *10; *Parkway Med. Care*, 2017 WL 1133282 at *9–10; *Spectrum Neurology*, 2016 WL 11395017

at *5; *Williams*, 2015 WL 5560543 at *7; *IAV Med. Supply, Inc.*, 2013 WL 764735 at *7; *Infinity Health Prods*, 2012 WL 1432213 at *4–5. However, because declaratory relief in cases like this run the risk of "encroach[ing] on the domain of" the state courts adjudicating pending suits, other courts in this district have found it appropriate to conduct an abstention analysis through the lens of the *Colorado River* abstention doctrine.[10] *See, e.g.*, *Am. Transit Ins. Co. v. Bilyk*, 514 F. Supp. 3d 463, 475 (E.D.N.Y. 2021) (collecting cases); *see also Gov't Emps. Ins. Co. v. Jacques*, No. 14-CV-5299 (KAM) (VMS), 2017 WL 9487191, at *9 (E.D.N.Y. Feb. 13, 2017), *adopted by* 2017 WL 1214460 (E.D.N.Y. Mar. 31, 2017); *Gov't Emps. Ins. Co. v. Leica Supply*, Inc., No. 11-CV-3781 (KAM) (VVP), 2014 WL 1311544, at *3 (E.D.N.Y. Mar. 28, 2014); *Gov't Emps. Ins. Co. v. Li-Elle Serv., Inc.*, No. 12-CV-2157 (KAM) (VMS), 2014 WL 1154244, at *2 (E.D.N.Y. Mar. 21, 2014); *Gov't Emps. Ins. Co. v. Five Boro Psychological Servs., P.C.*, 939 F. Supp. 2d 208 (E.D.N.Y. 2013).

In conducting that analysis, courts assessing similar circumstances have found that the relief requested in federal court (*i.e.*, common law fraud, unjust enrichment, and declaratory judgment claims) is sufficiently distinct from the relief sought by defendants in state proceedings such that the actions are not parallel and abstention is inappropriate. *See Li-Elle Serv.*, 2014 WL 1154244 at

---

[10] Under the doctrine, abstention may be appropriate in "situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 817 (1976). Pursuant to the *Colorado River* abstention doctrine, a district court may stay or dismiss a party's claims only where '(1) the relevant state and federal actions are "concurrent" or "parallel" and (2) evaluation of a six-factor test weighs in favor of abstention." *Gov't Emps. Ins. Co. v. Li-Elle Serv., Inc.*, No. 12-CV-2157 (KAM) (VMS), 2014 WL 1154244, at *3 (E.D.N.Y. Mar. 21, 2014) (quoting *DDR Constr. Servs. Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 644 (S.D.N.Y.2011)). The six *Colorado River* factors include: "(1) the assumption of jurisdiction by either court over any res or property; (2) the inconvenience of the federal forum; (3) the avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether state or federal law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction." *Id.* (quoting *Vill. of Westfield v. Welch's*, 170 F.3d 116, 120 (2d Cir.1999)). Importantly, the *Colorado River* court also cautioned that abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it" and "[a]bdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Colorado River*, 424 U.S. at 813.

*4; *Leica Supply, Inc.*, 2014 WL 1311544 at *4. *But see Five Boro*, 939 F. Supp. 2d at 216 (finding that a federal case regarding fraudulent insurance billing and state collection proceedings present an "example of parallel litigation in state and federal court."). Courts in this district have also found that "the *Colorado River* factors do not weigh in favor of abstention in actions by insurers seeking declaratory judgments regarding obligations relating to allegedly fraudulent claims," *see Bilyk*, 514 F. Supp. 3d at 476 (citing *Jacques*, 2017 WL 9487191 at *11; *Li-Elle Serv., Inc.*, 2014 WL 1154244 at *7; *Leica Supply*, *Inc.*, 2014 WL 1311544 at *7),[11] and that these cases do "not present the exceptional circumstances in which abstention is appropriate," *id.* (declining to abstain from adjudication where plaintiff submitted a chart demonstrating 181 collection actions and arbitrations pending between GEICO and defaulting defendants); *see also Five Boro*, 939 F. Supp. 2d at 217 ("declin[ing] to invoke the 'extraordinary and narrow exception' to this Court's duty to adjudicate a controversy properly before it" despite the "advanced stage of some of the state court proceedings") (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)).

Similarly here, the Court finds that the proceedings are not parallel, that the *Colorado River* factors counsel against abstention, and that this case does present the exceptional circumstances in which abstention is appropriate. As noted by the *Leica* and *Li-Elle* courts, the state court proceedings are suits for collection, and would not dispose of GEICO's common law fraud and unjust enrichment claims such that this action and the pending state actions are parallel. *See Li-Elle Serv.*, 2014 WL 1154244 at *4; *Leica Supply, Inc.*, 2014 WL 1311544 at *4. Further, the

---

[11] Certain of these courts have required supplemental submissions providing more detailed information regarding the status, nature, and posture of pending lawsuits in order to perform the abstention analysis; after receiving supplemental submissions, those courts subsequently "declined to abstain from granting the requested declaratory relief." *See Bilyk*, 514 F. Supp. 3d at 476 (collecting cases). Other courts, however, have not required the submission of supplemental information. *See id.* Here, the court finds that the documents already submitted by GEICO are sufficient to conduct the *Colorado River* abstention analysis despite the absence of particularized information regarding the status and nature of each pending action.

*Colorado River* factors weigh heavily toward the exercise of jurisdiction here, where: (1) the federal action does not involve a res over which this Court has exercised jurisdiction; (2) the federal forum is not inconvenient; (3) this Court's exercise of jurisdiction is necessary to avoid piecemeal litigation across nearly 800 separate actions; (4) GEICO's common law fraud and unjust enrichment claims do not implicate particularly novel or complex issues of state law; and (5) while the state courts would adequately protect the rights of the plaintiffs, the sheer number of actions suggests the unlikelihood of a prompt resolution. *See Jacques*, 2017 WL 9487191 at *10; *Leica Supply*, 2014 WL 1311544 at *5–7; *Li-Elle Serv.*, 2014 WL 1154244 at *4–7; *see also Five Boro*, 939 F. Supp. 2d at 216 n.8 (E.D.N.Y. 2013) ("GEICO alleges a systematic, institutionalized fraudulent scheme designed to produce thousands of individual fraudulent no-fault claims. I reject the suggestion that such a defense is better raised and resolved (potentially in conflicting ways) in every one of literally hundreds of small-dollar cases pending in numerous different state courts, rather than in a single case like this one."). Considering all of the *Colorado River* factors and the Court's "virtually unflagging obligation" to exercise jurisdiction, *Colorado River*, 424 U.S. at 817, abstention is unwarranted in this case.

In light of the foregoing, I respectfully recommend that the Court enter a declaratory judgment providing that Plaintiffs are not obligated to pay the outstanding fraudulent claims submitted by the Defaulting Defendants.

## **CONCLUSION**

For the reasons set forth above, I respectfully recommend that Plaintiff's motion for default judgment be granted in part, and that (1) judgment be entered against Dr. Sangavaram and Elmwood Park, jointly and severally, in the amount of $842,422.90 in compensatory damages plus pre-judgment interest as calculated above; (2) judgment be entered against Dr. Sangavaram and

Molnar Medical, jointly and severally, in the amount of $179,373.37 in compensatory damages plus pre-judgment interest as calculated above; and (3) a declaratory judgment be entered that the Plaintiffs are not obligated to pay the outstanding claims submitted by the Defaulting Defendants.

Plaintiffs' counsel is hereby directed to serve copies of this Report and Recommendation upon the defendants by regular and certified mail and to file proof of service with the Clerk of the Court. Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Frederic Block within fourteen (14) days of receipt hereof. Failure to file timely objections waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

RESPECTFULLY RECOMMENDED.


*Ramon E. Reyes, Jr.*

RAMON E. REYES, JR.
United States Magistrate Judge

Dated: February 23, 2022
Brooklyn, NY